1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

10

----oo0oo----

11

12   DENISE ALBERTO, individually
     and on behalf of others
13   similarly situated,

                                    NO. CIV. 07-1895 WBS DAD
14            Plaintiff,

15      v.                          MEMORANDUM AND ORDER RE:
                                    PRELIMINARY APPROVAL
16                                  OF CLASS ACTION SETTLEMENT

17

18   GMRI, INC., d/b/a OLIVE
     GARDEN, and DOES 1 through
19   100, inclusive,

20            Defendant.

21                             ----oo0oo----

22            Plaintiff Denise Alberto brought this matter seeking a

23   class action lawsuit against defendant GMRI, Inc., d/b/a Olive

24   Garden for its alleged failure to comply with (1) Industrial

25   Welfare Commission Order 5-2001, Cal. Code Regs. tit. 8, § 11070,

26   (2) the California Labor Code, Cal. Lab. Code §§ 201-203, 226,

27   1194, and (3) California's Unfair Competition Law, Cal. Bus. &

28   Prof. Code §§ 17200-17210.  Presently before the court is the

1

parties' joint motion for preliminary approval of class action settlement.

I.   Factual and Procedural Background

Defendant is a large casual dining restaurant company that owns, operates, and manages the popular Italian restaurant chain known as the "Olive Garden." (Compl. ¶ 6.)  From approximately November of 2003 to September of 2006, defendant employed plaintiff as a server at its Olive Garden location in Vallejo, California.  (Id. at ¶ 10.)

On July 31, 2007, plaintiff filed a putative class action complaint in state court claiming that defendant failed to (1) pay employees the legal minimum wage, (2) properly address "reporting time pay,"[1] and (3) provide accurate itemized statements.  (Id. at ¶ 2.)  Pursuant to 28 U.S.C. § 1441(b), defendant subsequently removed the case to this court on September 12, 2007 based on diversity jurisdiction, 28 U.S.C. § 1332.  (Def.'s Notice of Removal 3:5-6.)

After plaintiff amended her Complaint once as a matter of course on October 26, 2007, Fed. R. Civ. P. 15(a)(1), defendant filed motions to dismiss and/or strike portions of

_____

[1]   Section 5 of the Industrial Welfare Commission Wage Orders effectively delineates "reporting time pay" by providing that

an employee is required to report for work and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

Cal. Code Regs. tit. 8, § 11070(5)(A).

2

1 plaintiff's First Amended Complaint on November 8, 2007. (Docket

2 Nos. 15, 18-21.) Before the court could hear these motions,

3 however, the parties engaged in early mediation and thereafter

4 notified the court on April 22, 2008 that they had agreed to

5 settlement terms. (Id. No. 26.) Consequently, the parties now

6 seek preliminary approval of their Joint Stipulation of

7 Settlement and Release.

8 II.  Discussion

9       The Ninth Circuit has declared that a strong judicial

10 policy favors settlement of class actions. Class Plaintiffs v.

11 City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992).

12 Nevertheless, where, as here, "parties reach a settlement

13 agreement prior to class certification, courts must peruse the

14 proposed compromise to ratify both [1] the propriety of the

15 certification and [2] the fairness of the settlement." Staton v.

16 Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003).

17       In conducting the first part of its inquiry, the court

18 "must pay 'undiluted, even heightened, attention' to class

19 certification requirements" because, unlike in a fully litigated

20 class action suit, the court will not have future opportunities

21 "to adjust the class, informed by the proceedings as they

22 unfold." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620

23 (1997); accord Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th

24 Cir. 1998). The parties cannot "agree to certify a class that

25 clearly leaves any one requirement unfulfilled," and consequently

26 the court cannot blindly rely on the fact that the parties have

27 stipulated that a class exists for purposes of settlement. Berry

28 v. Baca, No. 01-02069, 2005 WL 1030248, at *7 (C.D. Cal. May 2,

1  2005); see also Amchem, 521 U.S. at 622 (observing that nowhere
2  does Rule 23 say that certification is proper simply because the
3  settlement appears fair).  In conducting the second part of its
4  inquiry, the "court must carefully consider 'whether a proposed
5  settlement is fundamentally fair, adequate, and reasonable,'
6  recognizing that '[i]t is the settlement taken as a whole, rather
7  than the individual component parts, that must be examined for
8  overall fairness . . . .'"  Staton, 327 F.3d at 952 (quoting
9  Hanlon, 150 F.3d at 1026); see also Fed. R. Civ. P. 23(e)
10 (outlining class action settlement procedures).

11        Procedurally, the approval of a class action settlement
12 takes place in two stages.  In the first stage of the approval
13 process, "'the court preliminarily approve[s] the Settlement
14 pending a fairness hearing, temporarily certifie[s] the Class . .
15 . , and authorize[s] notice to be given to the Class.'"  West v.
16 Circle K Stores, Inc., No. 04-0438, 2006 WL 1652598, at *2 (E.D.
17 Cal. June 13, 2006) (quoting In re Phenylpropanolamine (PPA)
18 Prods. Liab. Litig., 227 F.R.D. 553, 556 (W.D. Wash. 2004)).  In
19 this Order, therefore, the court will only "determine[] whether a
20 proposed class action settlement deserves preliminary approval"
21 and lay the ground work for a future fairness hearing.  Nat'l
22 Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 525
23 (C.D. Cal. 2004).  At the fairness hearing, after notice is given
24 to putative class members, the court will entertain any of their
25 objections to (1) the treatment of this litigation as a class
26 action and/or (2) the terms of the settlement.  See Diaz v. Trust
27 Territory of Pac. Islands, 876 F.2d 1401, 1408 (9th Cir. 1989)
28 (holding that prior to approving the dismissal or compromise of

4

claims containing class allegations, district courts must,
pursuant to Rule 23(e), hold a hearing to "inquire into the terms
and circumstances of any dismissal or compromise to ensure that
it is not collusive or prejudicial").[2]  Following the fairness
hearing, the court will make a final determination as to whether
the parties should be allowed to settle the class action pursuant
to the terms agreed upon.  DIRECTV, Inc., 221 F.R.D. at 525.

A.   Certification of the Class

A class action will only be certified if it meets the
four prerequisites identified in Federal Rule of Civil Procedure
23(a) and additionally fits within one of the three subdivisions
of Federal Rule of Civil Procedure 23(b).  Although a district
court has discretion in determining whether the moving party has
satisfied each Rule 23 requirement, Califano v. Yamasaki, 442
U.S. 682, 701 (1979); Montgomery v. Rumsfeld, 572 F.2d 250, 255
(9th Cir. 1978), the court must conduct a rigorous inquiry before
certifying a class.  Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S.
147, 161 (1982); E. Tex. Motor Freight Sys. v. Rodriguez, 431
U.S. 395, 403-05 (1977).

As noted above, despite the parties' stipulation that a
class exists for purposes of settlement, this does not relieve

---

[2]   As noted by this court in a previous Order, part of the
reasoning in Diaz appears to have been overruled by the United
States Supreme Court in Amchem.  West v. Circle K Stores, Inc.,
No. 04-0438, 2006 WL 1652598, at *2 (E.D. Cal. June 13, 2006).
Namely, Diaz assumed that a court could approve settlement
without certifying the class.  See Diaz, 876 F.2d at 1408
("Before certification, the dismissal is not res judicata against
the absent class members and the court does not need to perform
the kind of substantive oversight required when reviewing a
settlement binding upon the class.").  As the discussion above
illustrates, however, this reasoning is incompatible with the
Supreme Court's holding in Amchem.

1  the court of its duty to conduct its own inquiry.  Typically,

2  when parties settle before the class is certified, the court is

3  denied adversarial briefs on the class certification issue.

4  Although defendant now agrees, at least for the purposes of

5  settlement, that class treatment is appropriate, the court must

6  nonetheless decide whether the issues in this case should be

7  treated as class claims pursuant to Rule 23.

8       1.   Rule 23(a)

9       Rule 23(a) restricts class actions to cases where

10      (1) the class is so numerous that joinder of all  members
        is impracticable; (2) there are questions  of law or fact
11      common to the class; (3) the claims  or defenses of the
        representative parties are  typical of the claims or
12      defenses of the class; and (4) the representative parties
        will fairly and  adequately protect the interests of the
13      class.

14 Fed. R. Civ. P. 23(a).  These requirements are more commonly

15 referred to as numerosity, commonality, typicality, and adequacy

16 of representation, respectively.  Hanlon v. Chrysler Corp., 150

17 F.3d 1011, 1019 (9th Cir. 1998).

18           a.   Numerosity

19      While courts have not established a precise threshold

20 for determining numerosity, Gen. Tel. Co. v. E.E.O.C., 446 U.S.

21 318, 330 (1980), a class consisting of one thousand members

22 "clearly satisfies the numerosity requirement."  Sullivan v.

23 Chase Inv. Servs., Inc., 79 F.R.D. 246, 257 (N.D. Cal. 1978).  In

24 the instant matter, plaintiff offers declaratory evidence

25 estimating a potential class size of 18,000 members, including

26 all of the servers employed by defendant at nearly 100

27

28

restaurants over almost a five year period.[3]  (Poliner Decl. ¶ 7(a).)

Although plaintiff has not provided the court with any form of official documentation supporting this approximation, a court may rely on common sense assumptions to support findings of numerosity.  Manual for Complex Litigation (Fourth) § 23.22(3) (2008); see Sherman v. Griepentrog, 775 F. Supp. 1383, 1389 (D. Nev. 1991) (finding that a court may draw reasonable inferences of class size from facts before it); see, e.g., West v. Circle K Stores, Inc., No. 04-0438, 2006 WL 1652598, at *3 (E.D. Cal. June 13, 2006) ("[A]ccepting plaintiffs' alleged class size as true, and recognizing that the joinder of 1,752 plaintiffs would be impracticable, the court holds that the numerosity requirement is satisfied."); cf. Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975) (satisfying burden of Rule 23(a) requirements can be met by providing court with sufficient basis for forming a "reasonable judgment" on each requirement).[4]  Moreover, even if the actual class size falls below plaintiff's valuation of 18,000 members,

---

[3]     Specifically, the parties' Settlement Agreement states that the Settlement Class is composed of "non exempt employees of [defendant] in California who were employed in Covered Positions during the Covered Time Frame."  (Poliner Decl. Ex. A ("Settlement Agreement") ¶ A-5.)  Covered positions and time frame include: "all servers, including server breakers, who work or worked for GMRI at any Olive Garden restaurants in California . . . during the period beginning August 3, 2003, through June 10, 2008."  (Id. at ¶¶ 4-5, Settlement Agreement ¶ A-4.)

[4]     But see Siles v. ILGWU Nat'l Ret. Fund, 783 F.2d 923, 930 (9th Cir. 1986) (finding numerosity not met in case charging that pension fund eligibility requirements violated the Employee Retirement Income Security Act because, although plaintiff presented evidence that 31,000 employees were covered by the plan and lost their jobs, plaintiff failed to show how many employees were eligible for and failed to receive benefits).

it is reasonable to assume that its size will surpass previous
Ninth Circuit thresholds.  <u>See, e.g.</u>, <u>Gay v. Waiter's & Dairy
Lunchmen's Union</u>, 549 F.2d 1330 (9th Cir. 1997) (finding
numerosity requirement to be met with approximately 110 potential
class members); <u>Leyva v. Buley</u>, 125 F.R.D. 512, 515 (E.D. Wash.
1989) (allowing certification of a fifty-member class).

                    b.   <u>Commonality</u>

           Rule 23(a) also requires that "questions of law or fact
[be] common to the class."  Fed. R. Civ. P. 23(a)(2).  Because
"[t]he Ninth Circuit construes commonality liberally," "it is not
necessary that <u>all</u> questions of law and fact be common."  <u>West</u>,
2006 WL 1652598, at *3 (citing <u>Hanlon</u>, 150 F.3d at 1019).  "The
existence of shared legal issues with divergent factual
predicates is sufficient, as is a common core of salient facts
coupled with disparate legal remedies within the class."  <u>Hanlon</u>,
150 F.3d at 1019.

           Plaintiff identifies several common legal issues within
the putative class that purportedly would have been examined had
this case gone to trial, including whether defendant: (1) failed
to pay reporting time compensation; (2) failed to pay the legal
minimum wage; (3) engaged in unfair, unlawful, or fraudulent
business practices; (4) failed to promptly and timely pay
compensation owed to class members upon termination of their
employment; and (5) is liable for waiting time penalties based
upon defendant's willful retention of compensation.  (Poliner
Decl. ¶ 7(c).)

           The court agrees that the potential claims of class
members would arise from a set of circumstances similar to that

                                    8

1    of plaintiff, namely employment as a server in defendant's

2    restaurants between August 2003 and June 2008.  See Dukes v.

3    Wal-Mart, Inc., 509 F.3d 1168, 1177-78 (9th Cir. 2007) (stating

4    that the standard in Rule 23(a)(2) is "qualitative rather than

5    quantitative--one significant issue common to the class may be

6    sufficient to warrant certification").  Because it therefore

7    appears that the same alleged conduct of defendant would "form[]

8    the basis of each of the plaintiff's claims," Acosta v. Equifax

9    Info. Servs., L.L.C., 243 F.R.D. 377, 384 (C.D. Cal. 2007), class

10   relief based on commonality is appropriate.  See Califano v.

11   Yamasaki, 442 U.S. 682, 701 (1979) (holding that commonality

12   issues of the class "turn on questions of law applicable in the

13   same manner to each member of the class").

14              c.   Typicality

15              Rule 23(a) further requires that the "claims or

16   defenses of the representative parties [be] typical of the claims

17   or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality

18   requires that named plaintiffs have claims "reasonably

19   coextensive with those of absent class members," but their claims

20   do not have to be "substantially identical."  Hanlon, 150 F.3d at

21   1020.  The test for typicality "'is whether other members have

22   the same or similar injury, whether the action is based on

23   conduct which is not unique to the named plaintiffs, and whether

24   other class members have been injured by the same course of

25   conduct.'"  Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th

26   Cir. 1992) (citation omitted).

27              Plaintiff argues that all putative class members

28   suffered similar injuries as a result of defendant's alleged

                                   9

1   conduct--e.g., its failure to compensate server employees with
2   "reporting time pay" and to timely pay them upon their
3   termination.  Despite the absence of a formal discovery process,
4   plaintiff's counsel maintains that the parties conducted
5   extensive informal discovery and exchange of information,
6   particularly during the course of the early mediation process.
7   (Stipulation Regarding Stay of Action Pending Early Mediation ¶¶
8   2-4.)  After interviewing randomly selected settlement class
9   members and examining documents such as clock in/clock out
10  reports, wage compensation reports, confidential data sheets, and
11  schedules, plaintiff estimates that, on average, defendant's
12  "reporting time pay" violations deprived employees of one hour of
13  pay for every twenty-seven shifts they worked.  (Settlement
14  Agreement ¶ 9; Parties' Mem. in Supp. of Joint Mot. for
15  Preliminary Approval of Class Action Settlement 2:16-17.)  If
16  true, plaintiff's research suggests that her claims are typical
17  of the class.

18        As noted above, because the parties proposed a
19  settlement prior to certification, the record is devoid of
20  adversarial briefs on the subject that would have been
21  supplemented with commonly-generated products of formal
22  discovery.  The court's inability to examine prior meritorious
23  arguments regarding class certification--as well as evidence such
24  as the "clock in/clock out" and compensation reports--makes it
25  difficult to undertake a complete assessment of the potential
26
27
28

claims of putative class members.[5]  This element is an essential

part of conducting a standard typicality inquiry and in

determining if the injuries of the representative plaintiff are

in fact typical of the class.  See E. Tex. Motor Freight Sys.,

Inc., v. Rodriguez, 431 U.S. 395, 403 (1977) (noting that it is

essential to establish that the class representative "possess the

same interest and suffer the same injury" as class members in

order to satisfy typicality) (quoting Schlesinger v. Reservists

Comm. to Stop the War, 418 U.S. 208, 216 (1974)).

Nevertheless, for the purpose of preliminary

certification, the court is inclined to accept that the injuries

of the named plaintiff are likely to be "reasonably coextensive"

---

[5]     The lack of an adversarial record in this matter,
coupled with mediation and settlement prior to the formal
discovery phase, has left the court with little tangible evidence
regarding many of plaintiff's assertions.  Plaintiff and her
counsel have primarily submitted only anecdotal evidence in
furtherance of their argument that the Settlement Agreement meets
the Rule 23(a) requirements.  The principle United States Supreme
Court decision on determining Rule 23(a) requirements notes that
"actual, not presumed, conformance with Rule 23(a) remains . . .
indispensible" and that certification requires "rigorous
analysis." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147,
160, 161 (1982).  Although the court is aware of no cases on
point in the Ninth Circuit, other circuits have found that
anecdotal evidence is insufficient to justify certification
because such evidence usually cannot bridge the gap between
individual and class-wide claims. See, e.g., Sheehan v.
Purolator, 839 F.2d 99, 103 (2d Cir. 1988) (finding one affidavit
insufficient to establish existence of class); Harris v. Marsh,
100 F.R.D. 315, 322 (E.D.N.C. 1983) (finding anecdotal evidence
focusing on discrete occurrences insufficient to prove existence
of class).  Although courts are extremely reluctant to adopt a
rule categorically rejecting certification when supported solely
by anecdotal evidence, it appears that more evidence is needed
here. Plaintiff's request is filled with presumptions and
recitations of factual inquiries, but is bare when it comes to
actual documentation.  In order to protect the interests of the
absent class members, it will be necessary for counsel to produce
documentation at the fairness hearing prior to final approval.

with those of the putative class.[6]   Although class certification
should not be granted if "there is a danger that absent class
members will suffer if their representative is preoccupied with
defenses unique to it," <u>Gary Plastic Packaging Corp. v. Merril</u>
<u>Lynch, Pierce, Fenner & Smith, Inc.</u>, 903 F.2d 176, 180 (2d Cir.
1990), there is nothing unique about plaintiff's background or
factual situation that would require her to pursue a divergent
course of conduct at the expense of the putative class's
interest.  This settlement agreement, therefore, does not appear
to be the result of any exceptional circumstances or atypical
claims proffered by plaintiff.[7]

### d.   Adequacy of Representation

Finally, Rule 23(a) requires "representative parties
[who] will fairly and adequately protect the interests of the
class."  Fed. R. Civ. P. 23(a)(4).  To resolve the question of
legal adequacy, the court must answer two questions: (1) do the
named plaintiff and her counsel have any conflicts of interest
with other class members and (2) has the named plaintiff and her
counsel vigorously prosecuted the action on behalf of the class?
<u>Hanlon</u>, 150 F.3d at 1020.  This adequacy inquiry considers a

----

[6]   The court acknowledges that plaintiff's injury may be
more or less than that of other presumed class members.  This
difference, however, is not dispositive.  Specifically, a named
plaintiff's individualistic injury may nonetheless be found
typical of those of the remainder of the class, particularly if
the injury is the result of an alleged common practice.  <u>See</u>
<u>Dukes v. Wal-Mart, Inc.</u>, 509 F.3d 1168, 1185 (9th Cir. 2007)
("Some degree of individuality is to be expected in all cases,
but that specificity does not necessarily defeat typicality.").

[7]   Again, it shall be the responsibility of parties at the
final approval hearing to provide more detailed documentation in
support of typicality before the court will sanction the
settlement's approval.

number of factors, including "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." Brown v. Ticor Title Ins., 982 F.2d 386, 390 (9th Cir. 1992).

The examination of potential conflicts of interest in settlement agreements "has long been an important prerequisite to class certification.  That inquiry is especially critical when [] a class settlement is tendered along with a motion for class certification." Hanlon, 150 F.3d at 1020.  Here, the interests of plaintiff and her course of legal redress are not ostensibly at variance with those of putative class members. (See Poliner Decl. ¶ 8 ("Plaintiff's counsel is not aware of any conflicts of interest with other class members . . . .").)  Although the definition of the settlement class does encompass a large number of members, the class itself is narrowly defined: servers and server breakers who worked for defendant at any Olive Garden restaurants in California from August 3, 2003 through June 10, 2008.  See supra n.3.  This definition effectively minimizes the probability that the certification procedure will overlook legitimate yet dissimilar claims of class members; rather, the potential for conflicting interests will remain low while the likelihood of shared interests remains high.  See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) ("[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members.") (internal citation and quotations omitted).

13

1    The second prong of the adequacy inquiry examines the

2  vigor with which the named plaintiff and her counsel have pursued

3  the common claims.  "Although there are no fixed standards by

4  which 'vigor' can be assayed, considerations include competency

5  of counsel and, in the context of a settlement-only class, an

6  assessment of the rationale for not pursuing further litigation."

7  Hanlon, 150 F.3d at 1021.  Plaintiff's counsel's competency with

8  respect to class action litigation is significant.  Specifically,

9  a thorough declaration submitted to the court lists several class

10  action proceedings in both state and federal court in which

11  plaintiff's counsel served as either lead or co-counsel.

12  (Poliner Decl. ¶ 8.)[8]  Moreover, the majority of these class

13  action proceedings resulted in approved settlements.  (Id.)

14    Probing plaintiff and her counsel's rationale for not

15  pursuing further litigation, however, is inherently more complex.

16  "District courts must be skeptical of some settlement agreements

17  put before them because they are presented with a 'bargain

18  proffered for . . . approval without the benefit of an

19  adversarial investigation.'"  Hanlon, 150 F.3d at 1022 (quoting

20  Amchem, 521 U.S. at 620).  This logic is certainly applicable

21  here, namely because sparse documentation has been offered to

22  confirm that the settlement terms are adequate.  Plaintiff's

23  counsel again declares that a thorough investigation and

24

25    [8]    In the last three years alone, plaintiff's counsel's
26  firm has certified over thirty class action lawsuits that "have
   involved the failure to pay employees overtime, failure to
   provide employees with meal and rest breaks, untimely payment of
27  employees' wages upon termination, false and deceptive
   advertising, and unlawful deductions from tenants' security
28  deposits."  (Id.)

14

extensive informal discovery has led him to believe that the settlement is fair, reasonable, adequate, and in the best interest of the settlement class.  (Settlement Agreement ¶ 9.) Yet counsel has not presented the court with any corroborating documents to substantiate his conclusion.  The fact that the parties reached an agreement before an experienced mediator, while commendable, does not preclude a detailed review of the settlement terms.  Settlement adequacy should be scrutinized when there is evidence of fee-driven settlements, exorbitant service payments, or collusion between the parties.  Hanlon, 150 F.3d at 1022.  An examination of such concerns is addressed below in the preliminary fairness assessment.  See infra § II(2).

        The court reiterates the need for documentation that directly links plaintiff's assertions with the terms of the settlement agreement.  Nonetheless, pending the introduction at the final fairness hearing of evidence in support of counsel's findings, plaintiff's proffered "adequacy of representation" showing preliminarily demonstrates that plaintiff can sufficiently represent the class.

                2.   Rule 23(b)

        An action that meets all the prerequisites of Rule 23(a) may be maintained as a class action only if it also meets the requirements of one of the three subdivisions of Rule 23(b). Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 163 (1974).  In this case, plaintiff seeks certification under Rule 23(b)(3), "which is appropriate 'whenever the actual interests of the parties can be served best by settling their differences in a single action.'"  Hanlon, 150 F.3d at 1022 (citation omitted).  A class

15

1    action may be maintained under Rule 23(b)(3) if (1) "the court

2    finds that questions of law or fact common to class members

3    predominate over any questions affecting only individual

4    members," and (2) "that a class action is superior to other

5    available methods for fairly and efficiently adjudicating the

6    controversy."  Fed. R. Civ. P. 23(b)(3).

7                   a.   Predominance

8               Because Rule 23(a)(3) already considers commonality,

9    the focus of the Rule 23(b)(3) predominance inquiry is on the

10   balance between individual and common issues.  Hanlon, 150 F.3d

11   at 1022; see also Amchem, 521 U.S. at 623 ("The Rule 23(b)(3)

12   predominance inquiry tests whether proposed classes are

13   sufficiently cohesive to warrant adjudication by

14   representation").  The parties joint motion sufficiently

15   demonstrates that "[a] common nucleus of facts and potential

16   legal remedies dominates this litigation."  Hanlon, 150 F.3d at

17   1022.  Where the aforementioned common questions, see supra

18   II.A.1.b., "present a significant aspect of the case and . . .

19   can be resolved for all members of the class in a single

20   adjudication, there is clear justification for handling the

21   dispute on a representative rather than on an individual basis."

22   Id.

23              The existence of individualized issues in this action,

24   if any, does not preclude a finding of predominance.  See, e.g.,

25   Moreno v. AutoZone, Inc., No. 05-4432, 2008 WL 2271599, at *8

26   (N.D. Cal. May 30, 2008) (predominance inquiry satisfied even

27   though court would have to "grapple with individual issues, such

28   as whether a late paycheck reflects earned or unearned wages");

                               16

1    Kesler v. Ikea U.S., Inc., No. 07-0568, 2008 WL 413268, at *7

2    (C.D. Cal. Feb. 4, 2008) (predominance inquiry satisfied even

3    though "each putative class member's right to recovery depends on

4    the fact that he or she is a 'consumer' for the purposes of the

5    FCRA").  While both parties concede that putative class members

6    will be entitled to individualized damages, "individual issues

7    regarding damages will not, by themselves, defeat certification

8    under Rule 23(b)(3)."  West v. Circle K Stores, Inc., No.

9    04-0438, 2006 WL 1652598, at *7-8 (E.D. Cal. June 13, 2006)

10   (citing Blackie v. Barrack, 524 F.2d 891, 905-09 (9th Cir.

11   1975)); see also id. (finding predominance inquiry satisfied

12   despite the fact that "individual differences in accrual caps,

13   accrual rates, and amount of vacation time accrued" would result

14   in individualized damages).

15         To the extent that any further individual issues may

16   exist, there is no indication that such issues would be anything

17   more than "local variants of a generally homogenous collection of

18   causes" that derive from the named plaintiff's allegations.

19   Hanlon, 150 F.3d at 1022.  Such idiosyncratic differences,

20   therefore, "are not sufficiently substantive to predominate over

21   the shared claims."  Id. at 1022-23.

22              b.   Superiority

23         In addition to the predominance requirement, Rule

24   23(b)(3) provides a non-exhaustive list of matters pertinent to

25   the court's determination that the class action device is

26   superior to other methods of adjudication.  Fed. R. Civ. P.

27   23(b)(3)(A)-(D).  These matters include:

28

                                   17

(A) the interest of members of the class in individually
controlling the prosecution or defense of separate
actions;
(B) the extent and nature of any litigation concerning
the controversy already commenced by or against members
of the class;
(C) the desirability or undesirability of concentrating
the litigation of the claims in the particular forum; and
(D) the difficulties likely to be encountered in the
management of a class action.

Id. Some of these factors, namely (D) and perhaps (C), are

irrelevant if the parties have agreed to a pre-certification

settlement. Amchem, 521 U.S. at 620. Additionally, the court is

unaware of any concurrent litigation regarding the issues of the

instant case. In the absence of competing lawsuits, it is also

unlikely that other individuals have an interest in controlling

the prosecution of this action or other actions, although

objectors at the fairness hearing may reveal otherwise. As it

stands today, however, the class action device appears to be the

superior method for adjudicating this controversy.

    B.   Rule 23(e): Fairness, Adequacy, and Reasonableness of
        Proposed Settlement

      Having determined that class treatment appears to be

warranted,[9] the court must now address whether the terms of the

_____

    [9]    The court notes that it has conducted a full analysis
of the class certification question at this stage to determine if
all of the effort that will necessarily go into preparing for the
fairness hearing is appropriate. However, the court is not
required to make a final determination that class treatment is
appropriate until the final settlement approval, and it therefore
does not herein make that final determination. See In re Gen.
Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d
768, 797 (3d Cir. 1995) (holding that while the trustworthiness
of the negotiation process used to approve the settlement can be
relied on to justify provisional certification of a settlement
class, "final settlement approval depends on the finding that the
class met all the requisites of Rule 23").

18

parties' settlement appear fair, adequate, and reasonable.  In conducting this analysis, the court must balance several factors including

> the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Hanlon, 150 F.3d at 1026.  But see Molski v. Gleich, 318 F.3d 937, 953-54 (9th Cir. 2003) (noting that a district court need only consider some of these factors--namely those designed to protect absentees).  Given that some of these factors cannot be fully assessed until the court conducts its fairness hearing, "a full fairness analysis is unnecessary at this stage . . . ."  West, 2006 WL 1652598, at *9 (citation omitted).  The court, therefore, will simply conduct a cursory review of the terms of the parties' settlement for the purpose of resolving any glaring deficiencies before ordering the parties to send the proposal to class members.

### 1.   Terms of the Settlement Agreement

(1) **The Settlement Class:**  Class Members include all servers, including server breakers, who worked for the defendant at any Olive Garden restaurant in California from August 3, 2003, through June 10, 2008 ("class period").  (Parties' Mem. in Supp. of Joint Mot. for Preliminary Approval of Class Action Settlement 3:18-21.)

(2) **Notice:**  The Settlement Administrator will mail a notice of pendency of class action, proposed settlement and hearing date for court approval ("Notice") to Class Members, by first class mail, within thirty calendar days after the entry of the order granting preliminary approval of the settlement and Notice.  (Settlement Agreement ¶ 18.)  Included with the Notice, the

Settlement Administrator will provide Class Members with a Claim Form and a Request for Exclusion. (Id.)

(3) **Claim Forms:**  To be eligible to receive a portion of the settlement, Class Members must complete a Claim Form and return it to the Settlement Administrator within forty-five calendar days of the day Notice was mailed. (Id. at ¶¶ 24-25.)  If the Claim Form is not completed in full, the Settlement Administrator will send one deficiency notice, which will give the Claimant fourteen days to send a completed Claim Form. (Id. at ¶ 25.)  The Settlement Administrator will mail a reminder postcard to all Class Members who have not submitted a Claim Form within twenty days of the deadline. (Id. at ¶ 26.)

(4) **Requests for Exclusion:** To be excluded from the settlement, class members must complete a Request for Exclusion Form and return it to the Settlement Administrator within forty-five calendar days of the day Notice was mailed. (Poliner Decl. Ex. 1 ¶ III.B.) Submitting a Request for Exclusion Form preserves class members' rights to bring their own lawsuits against the defendant. (Id.)  If five percent or more of the Class Members request exclusion from the settlement, then the defendant will have the option of cancelling the settlement. (Settlement Agreement ¶ 27.)

(5) **Release:** "Class members who have not returned a completed Request for Exclusion Form will fully release and discharge [the defendant] and any of its former and present parent companies, subsidiaries, and affiliates, and the officers, directors, employees, partners, representatives, shareholders, agents, attorneys, insurers, successors, and assigns of all such entities ("Released Parties"), from any and all claims, rights, demands, debts, obligations, guarantees, liabilities, costs, expenses, attorneys' fees, damages, actions, and causes of action of every nature and description, whether known or unknown, contained in or related to the Action . . . ." (Settlement Agreement ¶ 14.)

(6) **Total Settlement Amount:** Defendant will contribute $700,000 to resolve all issues related to this litigation. (Settlement Agreement ¶ 11(a).)

(7) **Net Payment:** Defendant will contribute a fund of approximately $435,000 for the Settlement Class. (Parties' Mem. in Supp. of Joint Mot. for Preliminary Approval of Class Action Settlement 3:22-25.)  The Net Payment is the Total Settlement Amount ($700,000) less the attorneys' fees (not to exceed $150,000), the documented litigation costs (not to exceed $10,000), the service payment to the class representative (not to exceed $5,000), the employer's portion of any payroll taxes, and the costs of administering in the settlement

20

(not to exceed $70,000).  (Settlement Agreement ¶ 11(b), (f)-(i).)

(8) **Individualized Payment Amounts:**  The individual payment amounts will be allocated on a proportional basis according to the number of months each Claimant worked during the class period.  (Parties' Mem. in Supp. of Joint Mot. for Preliminary Approval of Class Action Settlement 3:25-27.)  Calculating the "Individual Payment Amount" requires a three-step process.  First, adding together all of the months worked by every Claimant to determine the "Total Work Months."  Next, dividing the "Net Payment" by the "Total Work Months" to find the "Dollars per Work Month."  Finally, multiplying the "Dollars per Work Month" by the number of months the individual Claimant worked.  (Settlement Agreement ¶ 11(c)-(d).)[10]

(9) **Objection to the Settlement:** Class members may object to the terms of the settlement by filing a written objection and a notice of intention to appeal at the final approval hearing within forty-five calendar days of the day Notice was mailed.  (Poliner Decl. Ex. 1 ¶ III.C.)  Objections must be mailed to Class Counsel, the Defendant's Counsel, and the Clerk of the Court.  (Id.)  If the court rejects the objection, the class member will be bound by the terms of the settlement unless he or she has also filed a Request for Exclusion.  (Id.)

## 2.  Preliminary Determination of Adequacy

At this preliminary approval stage, the court again need only "determine whether the proposed settlement is within the range of possible approval."  Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982) (internal quotations omitted).  Essentially, the court is only concerned with "whether the proposed settlement discloses grounds to doubt its fairness or

---

[10]    The Settlement Advisor will calculate Individual Payment Amounts twice.  First, he will calculate Individual Payment Amounts assuming every class member opted into the settlement and allocate the Net Payment using the three-step process described above.  (Settlement Agreement ¶ 11(c)-(d).)  Because it is realistic to assume that many class members will not return Claim Forms, the Settlement Advisor will also calculate the Remainder, or the unclaimed portion of the Net Payment, and allocate it to the Claimants using the same three-step process.  (Id.)

1  other obvious deficiencies such as unduly preferential treatment

2  of class representatives or segments of the class, or excessive

3  compensation of attorneys . . . ." West v. Circle K Stores,

4  Inc., No. 04-0438, 2006 WL 1652598, at *11 (E.D. Cal. June 13,

5  2006) (citation omitted).

6         The Ninth Circuit acknowledges that "assessing the

7  fairness, adequacy and reasonableness of the substantive terms of

8  a settlement agreement can be challenging." Staton v. Boeing

9  Co., 327 F.3d 938, 959 (9th Cir. 2003); see also id. (recognizing

10  the danger that class settlements could "result in a decree in

11  which 'the rights of [class members] . . . may not [be] given due

12  regard by negotiating parties"). The court is assisted in its

13  inquiry where, as here, "the stipulation and settlement appear to

14  be, for the most part, the result of vigorous, arms-length

15  bargaining." West, 2006 WL 1652598, at *11.

16         Counsel for both sides contend that they have been

17  diligent in pursuit of settlement. The parties also employed

18  David A. Rotman, widely recognized in this district as "a

19  prominent mediator with a specialty in employment discrimination

20  cases," to assist the negotiation of their settlement agreement.

21  Parker v. Foster, No. 05-0748, 2006 WL 2085152, at *1 (E.D. Cal.

22  Jul. 26, 2006); see also Glass v. UBS Fin. Servs., Inc., No.

23  06-4068, 2007 WL 221862, at *5 (N.D. Cal. Jan. 26, 2007) ("The

24  settlement was negotiated and approved by experienced counsel on

25  both sides of the litigation, with the assistance of a

26  well-respected mediator with substantial experience in employment

27  litigation[, and] this factor supports approval of the

28  settlement."). Additionally, the detailed notice provisions

22

1   proposed by the parties, (Poliner Decl. Ex. 1), clearly explain

2   to the putative class members what their options are and are thus

3   more than adequate.  (Poliner Decl. Ex. 1); see also Fed. R. Civ.

4   P. 23(c)(2)(B) (requiring only "the best notice that is

5   practicable under the circumstances" "[f]or any class certified

6   under Rule 23(b)(3)"); Churchill Vill., L.L.C. v. Gen. Elec., 361

7   F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it

8   'generally describes the terms of the settlement in sufficient

9   detail to alert those with adverse viewpoints to investigate and

10  to come forward and be heard.'" (quoting Mendoza v. Tucson Sch.

11  Dist. No. 1, 623 F.2d 1338, 1352 (9th Cir. 1980))).

12          To mitigate any further "inherent dangers of class

13  settlements," the fairness inquiry "focuses primarily upon

14  particular aspects of the decree that directly lend themselves to

15  pursuit of self-interest . . . namely attorneys' fees and the

16  distribution of relief . . . among class members." Staton, 327

17  F.3d at 960; see also id. ("We have characterized these inherent

18  dangers of class settlements as encompassing the possibility that

19  'the agreement . . . is the product of fraud or overreaching by,

20  or collusion between, the negotiating parties.'") (citation

21  omitted).

22              a.   Attorneys' Fees

23          In order for a settlement to be fair and adequate, "a

24  district court must carefully assess the reasonableness of a fee

25  amount spelled out in a class action settlement agreement." Id.

26  at 963.  The district court has discretion to use either the

27

28

1  percentage-of-the-fund method[11] or the lodestar/multiplier
2  method[12] in calculating fee awards in common fund cases.  In re
3  Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1295 (9th
4  Cir. 1994).  Because "no presumption in favor of either the
5  percentage or the lodestar method encumbers the district court's
6  discretion to choose one or the other," the choice between
7  percentage calculation and lodestar depends upon the
8  circumstances of the case.  Id. at 1295, 1296 (citing Six Mexican
9  Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir.
10  1990)).  Irrespective of the chosen method, "the district court
11  should be guided by the fundamental principle that fee awards out
12  of common funds be 'reasonable under the circumstances.'"  Id.
13  (quoting Florida v. Dunne, 915 F.2d 542, 545 (9th Cir. 1990)).

14          Plaintiff requests an attorneys' fee award "in the
15  amount of $150,000 . . . and up to $10,000 for out of pocket
16  expenses incurred in litigating this action."  (Poliner Decl. ¶
17  5.d.)  Plaintiff argues this amount is reasonable because it
18  constitutes approximately twenty-two percent of the total
19  settlement amount, a number slightly below the Ninth Circuit's
20  twenty-five percent benchmark for attorneys' fees in common fund
21  cases.  See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1029 (9th

22

23          [11]  Under the percentage-of-the-fund method, the court
24  calculates the fee award by designating a percentage of the total
    common fund.  Six Mexican Workers v. Ariz. Citrus Growers, 904
25  F.2d 1301, 1311 (9th Cir. 1990).

26          [12]  Under the lodestar method, the court calculates the fee
    award by multiplying the number of hours reasonably spent by a
27  reasonable hour rate and then enhancing that figure, if
    necessary, to account for the risks associated with the
28  representation.  Paul, Johson, Alston & Hunt v. Graulty, 886 F.2d
    268, 272 (9th Cir. 1989).

Cir. 1998) ("This circuit has established 25% of the common fund as a benchmark award for attorney fees.").  Nonetheless, the Ninth Circuit has also stated that "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases.  Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case."  Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002); see also In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d at 1295-96 (holding that, in passing on post-settlement fee applications, "courts cannot rationally apply any particular percentage--whether 13.6 percent, 25 percent or any other number--in the abstract, without reference to all the circumstances of the case").

While the instant record shows no evidence of bribery or collusion in reference to the requested attorneys' fees, it is nonetheless devoid of any direct support for plaintiff's counsel's requested fee amount.  Specifically, this action is less than a year old.  There has not been a single hearing in the matter, and the only motions filed (by defendant) were mooted by the parties' stipulated stay of action before plaintiff filed an opposition.  Not only did the formal discovery process never get underway, but the court had never even issued a status order delineating initial discovery disclosure deadlines.

Other than filing two complaints, engaging in mediation, and filing the instant joint motion, the circumstances necessitating a fee award for plaintiff's counsel at twenty-two percent of the settlement amount are not readily apparent to the court.  Compare Fischel v. Equitable Life Assur. Soc'y of the

U.S., 307 F.3d 997, 1007 (9th Cir. 2002) ("The fact that the case was settled early in the litigation supports the district court's ruling [not to award class counsel's twenty-five percent fee award request because] the 25 percent benchmark of the percentage-of-the-fund approach might very well have been a 'windfall.'"); with Vizcaino, 290 F.3d at 1050 (upholding twenty-eight percent fee award where class counsel submitted evidence showing that they "achieved excellent results" in a "extremely risky" matter, their "performance generated benefits beyond the cash settlement fund," and their representation of the class "extended over eleven years, entailed hundreds of thousands of dollars of expense, and required counsel to forgo significant other work, resulting in a decline in the firm's annual income"); see also Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1311 (9th Cir. Ariz. 1990) (affirming twenty-five percent fee award where "the litigation lasted more than 13 years, obtained substantial success, and involved complicated legal and factual issues"); Santos v. Camacho, No. 04-0006, 2008 WL 1699448, at *34 (D. Guam Apr. 10, 2008) (holding that, given "the minimal amount of discovery conducted" and the lack of "any pre-trial or trial proceedings," "[i]t seems quite clear that the requested 10% of the common fund would be unreasonable").

        The sole insight that plaintiff has provided to the court with respect to her counsel's representation is a statement in counsel's own affidavit declaring that "the parties propounded discovery and exchanged thousands of documents, interviewed numerous class members, opposed motions, undertook expert analysis, and mediated the case before a well respected

26

mediator." (Poliner Decl. ¶ 4.)  Because the record demonstrates

that plaintiff has not "opposed motions" nor supplied the court

with any products of her counsel's purported discovery, the court

is unsure what amount of weight should be given to this

conclusory assertion.[13]  See Chiaramonte v. Pitney Bowes, Inc.,

No. 06-1507, 2008 WL 510765, at *7 (S.D. Cal. Feb. 25, 2008)

(declining to award requested fee amount where the class

counsel's assertion of exceptional representation "is supported

by little more than conclusory statements about the expense,

time, and risk inherent in all class action litigation").

        Where, as here, plaintiff's counsel has not provided

sufficient documentation in support of its fee request, and the

circumstances "indicate that the percentage recovery would be

either too small or too large in light of the hours devoted to

the case or other relevant factors," the "benchmark percentage

should be adjusted, or replaced by a lodestar calculation." Six

Mexican Workers, 904 F.2d at 1311.  At the very least, a court

should employ the lodestar method as a cross-check on the

percentage method in order to ensure a fair and reasonable

result.  In re Immunex Sec. Litig., 864 F.Supp. 142, 144 (W.D.

---

[13]    Plaintiff's counsel also attempts to legitimize their
fee request by indicating that "defendant will not oppose the
motion of Plaintiff's attorneys . . . for [their] award."
(Poliner Decl. ¶ 5.d.)  A defendant's willingness to pay opposing
counsel's fees as part of a settlement agreement, however, does
not prove that the fee amount is reasonable.  Rather, "the
allocation between the class payment and the attorney's fees is
of little or no interest to the defense," whose priority is
"disposing of the total claim asserted against it." Staton v.
Boeing Co., 327 F.3d 938, 964 (9th Cir. 2003).  Worse, a
collusive settlement agreement could allow "a defendant to pay
class counsel excessive fees and costs in exchange for counsel
accepting an unfair settlement on behalf of the class." Lobatz
v. U.S. W. Cellular, 222 F.3d 1142, 1148 (9th Cir. 2000).

1  Wa. 1994); <u>see also</u> <u>Santos</u>, 2008 WL 1699448, at *34 ("[A]fter

2  doing a lodestar cross-check with the percentage requested, this

3  request of 10% seems far less reasonable.").

4      Because significant questions remain regarding the fair

5  and reasonable allocation of attorneys' fees, the court will

6  decline plaintiff's invitation to employ only the percentage-of-

7  the-fund method and will instead exercise its discretion to

8  calculate and/or cross-check the requested fee award via the

9  lodestar method.  As plaintiff has failed to provide the court

10 with any pertinent documentation, the court will instruct

11 plaintiff's counsel to file a thorough fee award petition prior

12 to the fairness hearing that details the hours reasonably spent

13 representing plaintiff in this action and the justification for

14 any enhancement due to risks associated with its representation.

15              b.   <u>Distribution of Award to Named and Unnamed</u>

16                   <u>Class Members</u>

17                   i.   <u>$5,000 Incentive Payment for the Named</u>

18                        <u>Plaintiff</u>

19      "[N]amed plaintiffs, as opposed to designated class

20 members who are not named plaintiffs, are eligible for reasonable

21 incentive payments." <u>Staton</u>, 327 F.3d at 977.  The district

22 court, however, must "evaluate their awards individually" to

23 detect "excessive payments to named class members" that may

24 indicate "the agreement was reached through fraud or collusion."

25 <u>Id.</u> at 975.  To assess whether an incentive payment is excessive,

26 district courts balance "the number of named plaintiffs receiving

27 incentive payments, the proportion of the payments relative to

28 the settlement amount, and the size of each payment." <u>Id.</u>

1    The proposed Settlement Agreement provides that

2    plaintiff shall receive an incentive payment of $5,000 for her

3    role as class representative.  (Settlement Agreement ¶ 11(f).)

4    Courts have generally found that $5,000 incentive payments are

5    reasonable.  See, e.g., In re Mego Fin. Corp. Sec. Litig., 213

6    F.3d 454, 463 (9th Cir. 2000) (approving incentive awards of

7    $5,000 each to the two class representatives of 5,400 potential

8    class members in a settlement of $ 1.725 million); In re

9    SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 535 (E.D.

10   Pa. 1990) (approving incentive awards of $5,000 for one named

11   representative of each of the nine plaintiff classes involving

12   more than 22,000 claimants in a settlement of $22 million).  In

13   previous cases, however, analogous incentive payments constituted

14   a significantly smaller portion of the overall settlement than

15   the instant plaintiff's proposed $5,000 incentive payment, which

16   constitutes 0.71% of the total settlement amount.  See In re Mego

17   Fin. Corp., 213 F.3d at 463 (total incentive payments did not

18   exceed 0.56% of total settlement); In re U.S. Bancorp. Litig.,

19   291 F.3d 1035, 1038 (8th Cir. 2002) (total incentive payments did

20   not exceed 0.35% of total settlement); Cook v. Niedert, 142 F.3d

21   1004, 1016 (7th Cir. 1998) (incentive payment did not exceed

22   0.17% of total settlement); In re SmithKline Beckman Corp., 751

23   F. Supp. at 535 (total incentive payments did not exceed 0.18% of

24   total settlement).

25

26

27

28

1        If every member of the class opted into the settlement,

2   each claimant would receive an average of only $24.17[14] while the

3   named plaintiff would receive more than $5,000.  Given this

4   explicit disparity and the utter lack of evidence demonstrating

5   the quality of plaintiff's representative service, the court may

6   be reticent to ultimately approve the parties' proposed

7   settlement.  See Ybarrondo v. NCO Fin. Sys., Inc., No. 05-2057,

8   2008 WL 183714, at *3 (S.D. Cal. Jan. 18, 2008) (refusing to

9   approve class settlement until the parties "address the issue of

10  the named Plaintiff's proposed $2,000 cash award, which appears

11  disproportionately large in comparison to the class members' $23

12  cash award[, by showing] how the named Plaintiff's award breaks

13  down between damages and incentive payment, and how the incentive

14  payment was earned").  On or before the date of the fairness

15  hearing, the parties should present or be prepared to present

16  evidence of the named plaintiff's substantial efforts taken as

17  class representative[15] to justify the discrepancy between her

18  award and those of the unnamed plaintiffs.  See Cook, 142 F.3d at

19  1016 (approving an incentive payment of 0.17% of total settlement

20  to the named plaintiff because he had "spent hundreds of hours

21  with his attorneys and provided them with an abundance of

22

23        [14]    The net payment is approximately $435,000 and the
    Settlement Class could include more than 18,000 members.
24  (Parties' Mem. in Supp. of Joint Mot. for Preliminary Approval of
    Class Action Settlement 3:22-25, 9:1-3 ($435,000 ÷ 18,000 =
25  $24.17).)

26        [15]    Relevant factors for the evaluation of the amount of
    incentive payments made to the named plaintiff include "the
27  actions the plaintiff has taken to protect the interests of the
    class, the degree to which the class has benefitted from those
28  actions, . . . and reasonabl[e] fear[s of] workplace
    retaliation."  Staton, 327 F.3d at 977 (citation omitted).

30

information"); <u>In re Cont'l Ill. Sec. Litig.</u>, 962 F.2d 566, 571-
72 (7th Cir. 1992) (upholding a district court's rejection of a
proposed $10,000 award to a named plaintiff "for his admittedly
modest services" in a settlement of $45 million).

ii.   <u>Apportionment of Payments Among Unnamed</u>
<u>Plaintiffs</u>

Settling parties are warned that "singling out a large
group of non-named plaintiff class members for higher payments
without regard to the strength of their claims" could eliminate
"the fairness of the settlement for the class as a whole."
<u>Staton</u>, 327 F.3d at 977.  Here, the three-step process for
apportioning the settlement among claimants[16] is concerning
because it calculates individual awards based on the duration of
each claimant's employment during the class period, not on the
actual strength of each claimant's claim.  (Settlement Agreement
¶ 11(c)-(d).)

Because the class is defined as "all servers . . . who
work or worked for [defendant]" during the class period,
(Settlement Agreement ¶ A.4), there is no distinction between,
for instance, full-time and part-time servers.  Using the
proposed procedure, therefore, a claimant with an equal or
stronger claim could receive a smaller portion of the settlement
than a claimant with a weaker claim simply because the latter

_____

[16]   The parties proposed three-step process for
apportionment of payments among claimants will function as
follows: first, add together all of the months worked by every
claimant to determine the "Total Work Months;" next, divide the
"Net Payment" by the "Total Work Months" to find the "Dollars per
Work Month"; finally, multiply the "Dollars per Work Month" by
the number of months the individual claimant worked.  (Settlement
Agreement ¶ 11(c)-(d).)

31

1 claimant worked for the defendant longer than the former claimant

2 during the proposed class period.[17]  At the fairness hearing, the

3 parties must demonstrate to the court that the procedure for

4 allocating the settlement complies with the aforementioned

5 standard of fairness.

6        While portions of the parties' proposed settlement

7 agreement admittedly suffer from the shortcomings discussed

8 above, the court trusts that these deficiencies can be cured

9 prior to the final fairness hearing in order to ensure a fair,

10 adequate, and reasonable settlement.  Accordingly, because the

11 court preliminarily finds that the class meets the requisite

12 certification standards and the terms of the parties' settlement

13 are acceptable pending the fairness hearing, the stipulation will

14 be granted.

15        IT IS THEREFORE ORDERED that the parties' joint motion

16 for preliminary approval of settlement be, and the same hereby

17 is, GRANTED.

18        IT IS FURTHER ORDERED that

19        (1) the following class be provisionally certified for

20 the purpose of settlement in accordance with the terms of the

21 stipulation:  All servers, including server breakers, who work or

22

23 ───────────

24        [17]   For example, imagine Server A worked <u>forty hours/month</u>
at one of defendant's California locations for twelve months

25 during the class period, while Server B also worked the same 480
hour total but at a rate of <u>forty hours/week</u>--thus working a

26 total of three months compared to Server A's year-long stint.
Despite working an equal total amount of hours as Server A and

27 thus suffering from identical exposure to defendant's alleged
employment improprieties, Server B's settlement recovery would

28 nonetheless be four times less than Server A's settlement
recovery.

32

worked for defendant at any Olive Garden restaurants in the state of California from August 3, 2003 through June 10, 2008;

(2) if the stipulation does not receive the court's final approval, should final approval be reversed on appeal, or should the stipulation otherwise fail to become effective for any reason (including any party's exercise of a right to terminate under the stipulation), the court's preliminary grant of certification of the class shall be vacated and become null and void without further action or order of the court;

(3) the stipulation and the settlement provided therein are preliminarily approved as fair, reasonable, and adequate within the meaning of Federal Rule of Civil Procedure 23, subject to final consideration at the fairness hearing provided for below;

(4) for purposes of the stipulation and carrying out the terms of the settlement only:

a.   plaintiff Denise Alberto is appointed as the representative of the class;

b.   the law firm of Westrup Klick L.L.P. is appointed as Class Counsel for the class and shall be responsible for the acts and activities necessary or appropriate to present this stipulation and the proposed settlement to the court for approval and, if the settlement is finally approved, to implement the settlement in accordance with the terms of the stipulation and orders of the court;

(5) Simpluris, Inc. is hereby approved and appointed as the Settlement Administrator to carry out the duties of the Claims Administrator set forth in the stipulation;

33

1   (6) the form and content of the Notice of Settlement of
2   Class Action (Poliner Decl. Ex. 1) is approved;

3   (7) the form and content of the Class Claim Form
4   (Poliner Decl. Ex. 2) is approved;

5   (8) the form and content of the Request for Exclusion
6   Form (Poliner Decl. Ex. 3) is approved;

7   (9) a hearing (the "Final Fairness Hearing") shall be
8   held before this court on October 27, 2008 at 2:00 p.m. in
9   Courtroom 5 to determine whether the proposed settlement, on the
10  terms and conditions set forth in the stipulation, is fair,
11  reasonable, and adequate and should be approved by the court; to
12  determine whether a judgment as provided in the stipulation
13  should be entered finally approving the settlement; and to
14  consider class counsel's applications for attorneys' fees,
15  reimbursement of costs, and service payments.  The court may
16  continue the Final Fairness Hearing without further notice to the
17  members of the class;

18  (10) within thirty-one (31) days before the Final
19  Fairness Hearing, Class Counsel shall file with this court their
20  petition for an award of attorneys' fees and reimbursement of
21  expenses.  Any objections or responses to the petition shall be
22  filed no later than twenty (14) days before the Final Fairness
23  Hearing.  Class Counsel may file a reply to any opposition to
24  memorandum filed by any objector no later than seven (7) days
25  before the Final Fairness Hearing.

26  (11) within thirty-one (31) days prior to the Final
27  Fairness Hearing, Class Counsel shall serve and file with the
28  court the Settlement Administrator's declaration setting forth

34

the services rendered, proof of mailing and list of all class
members who have time opted out of the settlement;

       (12) within thirty-one (31) days prior to the Final
Fairness Hearing, Class counsel shall file and serve all papers
in support of the settlement, request for enhancement for the
class representative, and any request for attorneys' fees and
costs;

       (13) any person who has standing to object to the terms
of the proposed settlement may appear at the Final Fairness
Hearing in person or by counsel, if an appearance is filed as
hereinafter provided, and be heard to the extent allowed by the
court in support of, or in opposition to, (1) the fairness,
reasonableness, and adequacy of the proposed settlement; (2) the
requested award of attorneys' fees, reimbursement of costs, and
incentive payment to class representative; and/or (3) the
propriety of class certification.  To be heard in opposition, a
person must, within forty-five (45) calendar days after notice is
mailed, (a) serve by hand or through the mails written notice of
his, her, or its intention to appear, stating the name and case
number of this litigation and each objection and the basis
therefore, together with copies of any papers and briefs, upon
class counsel and upon counsel for defendant, and (b) file said
appearance, objections, papers and briefs with the court,
together with proof of service of all such documents upon counsel
for the parties.  Responses to any such objections and Class
Counsel's application for attorneys' fees, reimbursement of
costs, and the class representative's incentive payment shall be
served by hand or through the mails on the objectors (or on the

1  objector's counsel if any there be) and filed with the Clerk of
2  this court no later than fourteen (14) calendar days before the
3  Final Fairness Hearing.  Objectors may file optional replies no
4  later than one week before the Final Fairness Hearing in the same
5  manner described above.  Any settlement class member who does not
6  make his, her, or its objection in the manner provided herein
7  shall be deemed to have waived such objection and shall forever
8  be foreclosed from objecting to the fairness or adequacy of the
9  proposed settlement as memorialized in the stipulation, the
10 judgment entered, and the award of attorneys' fees, expenses, and
11 the incentive payment unless otherwise ordered by the court;

12         (14) pending final determination of whether the
13 settlement should be ultimately approved, the court preliminarily
14 enjoins all class members (unless and until the class member has
15 submitted a timely and valid Request for Exclusion Form) from
16 filing or prosecuting any claims, suits, or administrative
17 proceedings regarding claims to be released by the settlement.
18 DATED:  June 23, 2008

20 WILLIAM B. SHUBB
   UNITED STATES DISTRICT JUDGE

36